The final case of the day is United States v. McGee. Mr. Henderson. Good morning, and may it please the court. My name is Peter Henderson. I represent Fred McGee in this case. I would like to start with the issue of the... Mr. Henderson, would you hold for a moment? It's not clear that Mr. Eldersma is online. I do not see him. We're going to try again. The course of true Zoom has not run smooth. All right. It looks like we have everybody. Now, Mr. Henderson, from the top. Thank you, Your Honor, and may it please the court. I am Peter Henderson. I represent Fred McGee in this case. I am going to start with a discussion of the sentencing enhancement under Section 3B1.1. And I think what we have in this case is a difference between what the government calls common sense judgment and what we call speculation. There really is not very much evidence about the relationships between the parties involved in this case. Fred McGee was caught red-handed with 100 grams of heroin, and we had one witness who was in the car describing exactly how that happened. But other than that, we really don't have any information. Terry Glaspie was that witness, and he worked for Charles McMillan in Chicago. He did odd jobs for him. He got paid in heroin and cash. And he knew of Fred McGee, and on this occasion, he was with Mr. McGee. But beyond that, we just don't know anything. So the district court found that this enhancement applied for two reasons. One was that Mr. McGee ran, however badly, a Minneapolis offshoot of the Chicago operation. There's just no evidence to support that observation. The government doesn't defend it on appeal. It's speculation about what's happening in Minneapolis. That's not common sense. That's speculation. The other reason related to the specific incident in January 2018. On that date, this was Mr. McGee's heroin, and two people were helping him transport it to Minneapolis. But the cases are clear, especially United States v. Collins, that one-time, one-off requests for help do not make somebody a supervisor. Is there evidence in the record, Mr. Henderson, that Mr. McGee used drivers on occasions other than the one at issue in this case? Not that I can see. That is the implication in the government's brief, but I don't see. They cite the January 2018 incident. Other than that, there really is no evidence. Mr. McGee used his girlfriend's, Ms. Schaefer's car, but the district court never found any facts about Ms. Schaefer's involvement. That really wasn't raised. It's something that's come up anew on appeal. So we really just have no evidence that this was more than an isolated incident. And what evidence is in the record regarding the nature of his drug distribution network in Minnesota? Not very much. We know that people owed him money. In other words, he had outstanding accounts receivable. We know he also had outstanding accounts payable. He owed Charles McMillan money. But we don't know if he had a number of customers. We don't know if he employed a number of people to sell his drugs for him. That is probably unlikely. The evidence we have is that 100 grams of heroin was the most he had ever bought. And in relative terms, that doesn't suggest a large enterprise. What the evidence shows is that he was a customer of Mr. McMillan. And Mr. McMillan maybe was a leader or organizer or supervisor. He was higher up on the chain. But we just don't have the evidence to support what happened lower down. We have what happened in the case.  And the government didn't introduce more evidence to establish this enhancement. What difference would it make in the sentencing if we were to find that maybe he wasn't an organizer or whatever? What's the difference in the sentencing? It's about a year. At the original sentencing, he was looking at 92 to 115 months. On remand, he'd be looking at 77 to 96 months. So it's about 60. He got seven years. He got 84 months. 84. And that could go either way, couldn't it? It could go either way. All things considered, we prefer to start with a range of 77 to 96 rather than 92 to 115. But I get your point. It is within the lower range. Let me turn to the question of allocution. There was never an invitation here for Mr. McGee to speak on his own behalf. There were directed questions. But there was never that invitation that's essential. And so this is very different from how they would put it down. Mr. Henderson, let me tell you what my principal question is about this. Does Mr. McGee say that he wanted to say something which he didn't have the opportunity to say because of the district judge's intervention? Yes, he wanted the opportunity to have his own interrupted time. I'm asking a somewhat different question. Is there something concrete, some information that he wanted to provide or some plea he wanted to make that he did not have the opportunity to do? That information is not in the record. I don't have it. That's his choice. It was easy for him or you to say, here's what I would have said if he'd let me, if the judge had let me. But I just want to be sure that there is not some concrete thing that McGee said, I wanted to tell the district judge, but I couldn't. I don't have any concrete thing to add. No, that's correct. But, and that's the curious thing about the plain error standard on these cases. The Luke case talks about the tension between law and plain error. Usually we need that because it's our burden to show an effect on substantial rights. But with allocution, it's just not in the record. So you do see parts of the record where he began to answer the judge's questions and was immediately cut off. He tried to say, well, I learned my lesson. And judges, no, you didn't. I had a path to rehabilitation. I don't think that's true. I was committed to that path. No, I don't think you are. I don't think you are taking it seriously. So every opportunity where he started to offer his own thoughts about issues and mitigation, he was cut off. And so that's where we think the denial of the right of allocution occurred. We think given all of the errors, including the criminal history error identified, the best course in this case is to send this back for resentencing and make sure that procedurally everything goes according to the rules. So I see I have a little bit of time left. I'd like to reserve that for rebuttal. Certainly, counsel. Mr. Elgersman. Thank you, Your Honors. And may it please the Court. My name is Chad Elgersman. I'm an assistant U.S. attorney in the Western District of Wisconsin. I'm representing the United States in this matter. Mr. Elgersman, I'd like to start with that last point. Because I'm wondering if you can point to any portion of the sentencing hearing in which Mr. McGee was given the opportunity to speak for himself. That was not in response to questions from the Court. And if not, how do you think we can hold that there's no possibility of a lower sentence when he was provided no opportunity to speak at all? And so we have no idea of what he might have said. And the judge has no idea of what he might have said. Yes, Your Honor. I do acknowledge that the Court did not use any magic words, did not personally invite the defendant to speak. However, he did personally address the defendant as required under Federal Rule of Criminal Procedure 32. Mr. Henderson noted, and he's correct, that Mr. McGee, no matter what he tried to say, it seemed he was cut off at every turn. No, no, no. No matter what he started to say. Yes, Your Honor. I do acknowledge that there certainly was a discussion or conversation between the judge and the defendant. I think that the judge was doing his best to make sure that the record adequately represented mitigation. I think the judge came in wanting to render a sentence below the guideline range. I think he wanted to make sure that the sentence adequately reflected the mitigation presented. And so I think that's why the judge repeatedly asked questions and engaged in a conversation with the defendant. He's such a terrific judge, Judge Conley. But our case law doesn't call for a conversation between. It calls for an allocution where a defendant has the right to just speak. And I'm concerned about the fact that he was cut off with such regularity. And I am also wondering if there's any factual basis for the leadership enhancement other than the one-time use of a driver and companion, which involved Mr. McMillan as well. Yes, Your Honor. To briefly address the last concern you had about the allocution, I would like to point out that United States v. Arrobo does make the point that Rule 32 really doesn't provide for a script. It doesn't tell district courts what to say during the allocution. And I do think that the judge, and I agree, Judge Conley is an outstanding judge, and I think he cares about the defendants. And I think he wanted to make sure that the record adequately reflected the mitigation. And I think he certainly did his best to make that happen. Regarding your question about evidence of other drivers, we do know that the defendant lived in Minneapolis. He traveled down to Chicago on a regular basis every couple of weeks, in fact. And he did that over the course of many years. So he may not have been picking up a large amount of drugs, but he made up for that in the frequency of his trips to Chicago. And we do know that his girlfriend, Charity Schaefer, accompanied him on several of these trips to Chicago. And we do know that Charity Schaefer had a more involved relationship. They were more than just boyfriend or girlfriend, because in a recorded jail call after their arrest, the defendant contacted Charity Schaefer and actually asked her to collect on outstanding debts from about six different people. So I would argue that that is more than simply just a boyfriend-girlfriend relationship, that that is one of the many factors that I think Judge Connolly considered when trying to determine whether he could make a common sense judgment that there was a hierarchy and that the defendant had some control over the subordinates below him. And to continue on the first issue, the leadership enhancements, we know that there's additional evidence that supports this. So Section 3B1.1 of the Sentencing Guidelines provides for this enhancement, and the defendant received the lowest level enhancement, two levels under subsection C. The district, there's no direct definition of what a leader or an organizer is, but Application Note 4 provides several factors that the court can consider. But United States v. House tells us that these factors are not prerequisites. In fact, they should be used to the extent that they help a district court make a straightforward determination whether a defendant was a leader or an organizer. And United States v. House, United States, or pardon me, United States v. Hargis and Mahaffey, they tell it a little differently. They say the factors should support a common sense judgment. I think the defendant calls this speculation. He points to individual facts and claims that these facts are more speculation. He reviews them with blinders on. He's reviewing them in their individual capacity. But when you review them collectively, they certainly do support a common sense judgment. So in addition to Ms. Schaffer, we know that on January 31st, 2018, the defendant was in Chicago. He met with Charles McMillan and he picked up a load of fentanyl-laced heroin. He decided where those drugs were going to be hidden inside his girlfriend's vehicle. He chose to hide them behind the glove compartment. And we also know that he had a problem. He needed someone to help him drive the drugs back to Minneapolis. So he directly recruited Terry Glaspie and he indirectly recruited Wayne Frazier. We also know that he paid Mr. Frazier for his services. So there was an employer-employee relationship there. When they were stopped and arrested, Mr. Frazier, pardon me, the defendant and Mr. McMillan engaged in a number of recorded jail calls. And during those jail calls, the defendant was reprimanded by Mr. McMillan for not doing his job. Mr. McMillan reprimanded the defendant because he failed to manage Wayne Frazier and make sure that he didn't speed on the way back. So, Your Honors, when you look at all of the facts collectively, they certainly do support a common-sense judgment. And it's more than just mere speculation. I see that my time is coming up, so I'd like to briefly address the last issue raised by the defendants. I think all the parties can agree that this is a relatively minor issue, that the government does concede there was a minor miscalculation of the defendant's criminal history points. I don't want to tell her that this had absolutely no effect on his criminal history score, his advisory guideline range, or his sentence. And there's nothing in the record that supports the defendant's argument that it somehow affected the 3553 analysis conducted by Judge Connolly. So, therefore, the government considers it a harmless error and does not warrant remand. So, for all of those reasons, Your Honor, the government asked that the lower court's sentence be affirmed. If there are no other questions, yes. Thank you, Counsel. Yes, the government rests on its submissions. Mr. Henderson, anything further? Mr. Henderson? I'm sorry about that. We do agree that the third issue isn't a standalone issue. But I do disagree. 16 versus 13 criminal history points is a Section 3553A factor, which is precisely why the prosecutor brought it up, that sentencing. But it's not a standalone error. We need to win on one of the first two issues for resentencing. We agree on that. The only thing I'd say in response to the government's argument, the government focuses now on appeal on Charity Schaefer. She was not a subject of fact-finding of any sort of litigation in the district court. Maybe she was a conspirator, a co-conspirator. Maybe she occupied the same level. Maybe she was an innocent bystander. Who knows? It's just not in the record. So we don't think it would be appropriate for the court to affirm the enhancement on that basis. But otherwise, I think I've covered everything in my briefs. So I will end. Thank you. Thank you very much, counsel. The case is taken under advisement and the court will be in recess.